Troy P. Foster #017229
Megan Weides #033552
**The Foster Group, PLLC**
902 W. McDowell Road
Phoenix, Arizona 85007
Tel: 602-461-7990
tfoster@thefosterlaw.com
mweides@thefosterlaw.com
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Millicent Archer, an individual,<br><br>Plaintiff,<br><br>v.<br><br>Mesa Unified School District No. 4; Kathy Eustace, in her individual capacity and official capacity; and Renee Parker, in her individual and official capacity,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>(Jury Trial Demanded) |

For her Complaint against Mesa Unified School District No. 4 (the "District"), Kathy Eustace ("Ms. Eustace"), and Renee Parker ("Ms. Parker") (collectively, the "Defendants"), Plaintiff Millicent Archer ("Ms. Archer" or "Plaintiff") alleges as follows:

**Parties and Jurisdiction**

1. At all times relevant to this Complaint, Ms. Archer resided in and was a citizen of Maricopa County, Arizona.

2. Upon information and belief, Ms. Eustace resides in and is a citizen of Maricopa County, Arizona.

3. Upon information and belief, Ms. Parker resides in and is a citizen of Maricopa County, Arizona.

1

4. At all times relevant to this Complaint, Ms. Archer worked for the District at its Red Mountain Center for Early Education ("RMC") in Mesa, Arizona.

5. Ms. Archer was a county employee from approximately August 1, 2019 to June 4, 2021.

6. At all relevant times, Ms. Archer was employed as the Early Childhood Special Education Department Specialist.

7. Ms. Kathy Eustace was the Principal at RMC and was Ms. Archer's direct supervisor.

8. Ms. Renee Parker was the Director of Certified Personnel in Human Resources for the District.

9. Ms. Archer brings claims pursuant to 42 U.S.C. § 1983 and 20 U.S.C. § 1412.

10. This Court has original subject matter jurisdiction over Ms. Archer's claims based on 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

11. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the claims alleged in the Complaint arose in this District.

### The "Mesa Way" is the Kathy Way

12. Prior to joining RMC, Ms. Archer worked in early special education for nearly thirty (30) years.

13. Ms. Eustace approached Ms. Archer about teaching in Mesa, and was offered a position by Ms. Eustace's boss, Allen Quie.

14. While considering the first offer, Ms. Archer was asked by Kimberly Freehan as the Director of Early Childhood for Mesa to interview for a department specialist position, which aligned perfectly with Ms. Archer's experience and skill set.

15. Ms. Eustace was part of Ms. Archer's interviewing team and Ms. Archer was offered the position, which she gladly accepted in 2019.

16. Initially, Ms. Archer loved her job and worked side-by-side with Ms. Freehan and the other early childhood department specialist, Trish Pemberton.

17. The dynamics changed in December 2019 when Ms. Eustace insisted on Ms. Archer splitting her time between her, in another department, and Ms. Freehan.

18. The transition was difficult for Ms. Archer as Ms. Eustace regularly complained that Ms. Freehan and Ms. Pemberton did not understand childhood special education and was borderline verbally abusive toward Ms. Archer.

19. Ms. Archer with Ms. Freehan and Ms. Pemberton eventually reported this behavior to Ms. Freehan's supervisor on May 1, 2020.

20. A few weeks later, Ms. Archer received a poor performance evaluation from Ms. Eustace and a Memorandum of Understanding for performance issues that were never brought to Ms. Archer's attention previously.

21. Ms. Freehan tried to intervene on Ms. Archer's behalf since she was still technically her supervisor for half the time, to no avail.

22. Ms. Eustace determined that Ms. Archer needed to work for her only and stopped allowing her to collaborate with Ms. Freehan and Ms. Pemberton, who were essential for Ms. Archer to complete her work.

23. That was the reason why the District hired Ms. Archer – to integrate special education into the classroom, and she was being banned from working with her counterparts who were assisting with that initiative.

24. It was clear that the "Mesa Way' was really the "Kathy Way".

**Ms. Archer Reports Violations of Federal Law and Other Matters of Public Concern**

25. In October of 2020, Ms. Archer shared with Ms. Parker that she believed she was experiencing a hostile work environment and harassment by Ms. Eustace.

26. In February of 2021, Ms. Archer was asked by Ellen Hall to observe a classroom that was transitioning children into a less restrictive classroom placement.

27. Ms. Hall explained that the teacher was struggling with classroom management, set up, and developmentally appropriate practices.

28. Ms. Archer observed several egregious violations of basic federal laws that are absolutely vital for the development of special education children.

29. Her biggest concern was the teacher denying children access to their instructional materials and access to the general education curriculum, Free Appropriate Public Education ("FAPE").

30. Another area of concern was the fact that the student's Individual Education Plans ("IEP") were not compliant with the Individuals with Disability Education Act ("IDEA").

31. It appeared that the children were poorly supervised and not being directed appropriately.

32. Moreover, there was not a single book in the early child self-contained special classroom.

33. This teacher and classroom's issues were not an isolated problem as several other classrooms suffered similar problems.

34. Compounding the problems even more, the teachers were not communicating with the students' parents that the IEP's were not compliant or being followed properly, or were unable to as many parents did not speak English.

35. Not only did Ms. Archer communicate these violations with the teacher and Ms. Hall, she immediately reported it to Ms. Eustace.

36. Ms. Archer brought this to Ms. Eustace's attention repeatedly and regularly.

37. Another concern Ms. Archer regularly brought to Ms. Eustace was the fact an inclusion classroom offsite of RMC was not complying with Child Find per the IDEA. The child had received outside speech services. Mesa's teacher and speech therapist did not initiate classroom services.

38. Ms. Eustace dismissed Ms. Archer's complaints or would refer her to Ms. Parker, who would not address these violations and concerns.

39. Instead, Ms. Eustace prohibited Ms. Archer from completing many classroom observations and from all interactions with Ms. Hall.

40. On April 8, 2021, Ms. Archer filed a formal complaint with Ms. Parker concerning the behavior of Ms. Eustace alleging harassment.

41. Ms. Parker commented that it sounded like retaliation but would not give Ms. Archer a new complaint form to complete despite Ms. Archer's request to do so.

42. In that complaint, Ms. Archer stated Ms. Eustace's actions "undermines my experience and interferes with my ability to carry out my job responsibilities as outlined by my job description."

43. A non-exclusive list of the interference included: Ms. Eustace banning Ms. Archer from essential meetings, from observing any classrooms, from speaking with other teachers, and from her collaborative colleagues Ms. Freehan and Ms. Pemberton.

**Ms. Eustace and Ms. Parker Retaliate Against Ms. Archer**

44. A month or so after Ms. Archer complained to Ms. Parker about a hostile work environment and harassment, Ms. Eustace placed her on a performance improvement plan and rated her poorly in 4 areas on her evaluation, which Ms. Archer appealed.

45. After the classroom observation in February 2021 and Ms. Archer raising concerns about violations of FAPE and IDEA on numerous occasions, Ms. Archer was prevented from observing any other classrooms or speaking to teachers to correct the violations.

46. Not only that, Ms. Eustace stopped inviting Ms. Archer to essential meetings necessary to complete her job duties.

47. Once Ms. Archer made a formal complaint against Ms. Eustace and the issues with completing her job duties, Ms. Parker did not respond to her until the day before her contract was to expire.

48. Even though Ms. Parker's investigation determined that Ms. Eustace had acted inappropriately and unprofessionally to Ms. Archer, Ms. Parker concluded that there had not been any retaliation by Ms. Eustace.

49. Ms. Archer's evaluation appeal was denied despite a third-party evaluator found her performance to be effective, Ms. Eustace's failure to provide any evidence to support her rankings, and Ms. Archer's evidence refuting Ms. Eustace's rankings.

50. Ms. Eustace and Ms. Parker determined that Ms. Archer's contract should not be renewed, and her employment terminated.

## Allegations Concerning Damages

51. As a result of Defendants' actions, Ms. Archer has been without any income since her termination.

52. When she attempted to obtain unemployment, Ms. Parker contested it and the claim was denied.

53. Ms. Archer was given an offer of employment involving another school, but the offer ended up being pulled.

54. Upon information and belief, Ms. Parker gave Ms. Archer a negative reference and caused Ms. Archer to lose that employment opportunity.

55. The comments and circumstances surrounding Ms. Archer's termination have damaged her reputation and made finding replacement employment difficult.

56. The Defendants' conduct was reckless and callously indifferent during and after Ms. Archer's employment by ignoring any of her reports of concern and by blatantly misrepresenting the circumstances surrounding her termination.

57. Ms. Archer has suffered physical ailments and severe emotional distress.

58. Ms. Archer also suffers from sleep deprivation and insomnia as a result of Defendants' conduct.

59. Ms. Archer is entitled to general and actual compensatory damages, punitive damages, lost wages, attorneys' fees and costs, and pre- and post-judgment interest on the award.

## LEGAL CLAIMS

### Count One: First Amendment Violation (42 U.S.C. § 1983)
### (Against All Defendants – All Capacities)

60. Ms. Archer re-alleges and incorporates by reference the allegations in Paragraphs 1–58.

61. At all relevant times, the District was acting under color of State law.

62. At all relevant times, Ms. Eustace was acting under color of State law.

63. At all relevant times, Ms. Parker was acting under color of State law.

64. In her role, Ms. Eustace had authority and discretion to take adverse action against Ms. Archer and did take such action.

65. In her role, Ms. Parker was the final decision-maker with respect to adverse action taken against Ms. Archer, and she took such action.

66. The District affirmed the adverse actions taken by Ms. Eustace and Ms. Parker against Ms. Archer.

67. In their respective roles, all Defendants were charged with ensuring the workplace was free from adverse actions for the proper exercise of speech, the violation of which infringes upon an employee's First Amendment rights under the United States Constitution.

68. As the decision-maker at RMC, Ms. Eustace established the school's policies and customs—either directly or by condoning the acts of subordinates.

69. Ms. Eustace and Ms. Parker took action against Ms. Archer in their own right and condoned the acts of her subordinates by not addressing Ms. Archer's many protected complaints.

70. Because of the enabling by the District concerning Ms. Eustace and Ms. Parker, it is complicit in establishing the custom of termination for employees speaking out on matters of public concern.

71. Ms. Archer complained to Ms. Eustace and Ms. Parker about (1) denying children access to FAPE; (2) serious violations of the IDEA; and (3) the lack of communication to students' parents about non-compliance with IEP's.

72. Ms. Archer's complaints raised matters of public concern.

73. Ms. Archer had the right to voice matters of public concern, as protected by her First Amendment rights under the United States Constitution.

74. Defendants took adverse action against Ms. Archer after she raised these complaints pursuant to a policy/custom of prohibiting employees from voicing matters of public concern.

75. All of Ms. Archer's rights, as articulated above, were clearly established and recognized at the time of the adverse action.

76. Ms. Eustace and Ms. Parker abused their respective positions given to them by the government while acting under the color of State law.

77. By Ms. Eustace and Ms. Parker's actions in their official capacities, the District is vicariously liable.

**Count Two: Violation of the False Claims Act – Retaliation (31 U.S.C. §3730(h))**
**(Against the District)**

78. Ms. Archer re-alleges and incorporates by reference the allegations in Paragraphs 1–76.

79. Ms. Archer is a person as that term is used in the False Claims Act ("FCA") (31 U.S.C. §§ 3729–33).

80. The District is person as that term is used in the FCA.

81. The Individuals with Disability Education Act ("IDEA") is administered by the government of the United States that is overseen by the United States Department of Education, Office of Special Education and Rehabilitative Services.

82. The IDEA was designed to establish equal opportunity of education to individuals with disabilities and provide regulations to ensure compliance.

83. As an incentive to comply with IDEA, educational institutions receive federal funding from the United States government.

84. As a recipient of this funding and to be eligible for it, the District is required to submit a plan that complies with the Individuals with Disability Education Act.

85. Part of these plan requirements include access to FAPE, IEP's for all children with disabilities, complying with child find, and putting disabled children in the least restrictive classroom environment.

86. As outlined in this complaint, the District not only falls short of complying with the IDEA, but it knowingly submits false documents misrepresenting compliance.

87. The FCA, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim.

88. The FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to be used or made a false record or statement material to a false or fraudulent claim paid or approved by the Government a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of $5,500 and $11,000 per claim.

89. The FCA, 31 U.S.C. § 3729(a)(1)(C), makes any person who conspires to commit a violation of the FCA liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim.

90. The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested. *See* 31 U.S.C. § 3729(b)(2).

91. When an educational institution submits a claim for payment (the IDEA plan), he or she does so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law.

92. Furthermore, the FCA, 31 U.S.C. § 3730(h), provides relief to employees who have been retaliated against in their employment because of lawful acts done by the employee in furtherance of efforts to stop one or more violations of the FCA. Such retaliation may include discharge, demotion, suspension, threats, harassment, or any other type of discrimination in the terms and conditions of employment.

93. In cases of retaliation, the employee is entitled to all relief necessary to make the employee whole, including reinstatement, two times back pay, interest on the back pay, and compensation for any special damages, including litigation costs and reasonable attorney's fees.

94. Ms. Archer reasonably believes that Defendant violated the FCA by engaging not complying with the IDEA and submitting false records showing compliance in order to receive federal funding.

95. Ms. Archer reasonably believed, and still believes, that Defendant's conduct violated the FCA and other federal and state laws.

96. Ms. Archer reported her beliefs that RMC was engaged in improper behavior when she reported her concerns to Ms. Eustace and Ms. Parker.

97. Ms. Archer's reporting was her effort to stop conduct that constituted a violation of the FCA.

98. As a result of engaging in the protected activity, Ms. Archer was terminated.

99. Defendant's conduct violated the anti-retaliation provision of the FCA. *See* 31 U.S.C. § 3730(h)(1).

100. The retaliatory nature of Defendant's decision to terminate Ms. Archer is evidenced by the timing of her adverse treatment and termination.

101. As a result, Plaintiff is entitled to relief as outlined in 31 U.S.C. § 3730(h)(2), including back pay, double damages, compensatory damages, special damages, and attorneys' fees and costs.

**PRAYER FOR RELIEF**

**THEREFORE**, Plaintiff respectfully requests the following relief:

A. A judgment in her favor against Defendants;
B. Pre- and post-judgment interest on the award;
C. Lost wages in the form of back pay and front pay;
D. Compensatory damages;
E. Punitive damages;
F. Special damages;
G. Reasonable attorneys' fees and costs; and
H. All other appropriate equitable relief.

**RESPECTFULLY SUBMITTED** this 21st day of March, 2022.

**The Foster Group, PLLC**

*/s/ Troy Foster*
Troy Foster
Megan Weides
902 W. McDowell Road
Phoenix, Arizona 85007
*Counsel for Plaintiff*